UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

COURTNEY MCCREE,                          )
                                          )
                    Plaintiff,            )
                                          )
         vs.                              )      3:13-cv-00209-RLY-WGH
                                          )
ECHO COMMUNITY HEALTH CARE,               )
INC.,                                     )
                                          )
                    Defendant.            )

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Courtney McCree, is a former employee of the defendant, ECHO

Community Health Care, Inc. ("Echo"). Following her termination, Plaintiff filed a

Complaint alleging three causes of action: (1) interference with her rights under the

Family Medical Leave Act ("FMLA"); (2) retaliation for the exercise of her rights under

the FMLA; and (3) wrongful discharge under Indiana law. Echo now moves for

summary judgment. For the reasons set forth below, the court **GRANTS** Echo's motion.

## I.    Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the

proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate

if the record "shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine

1

issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a motion for summary judgment, the burden rests with the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id*. at 322-23. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 585-87); *Celotex*, 477 U.S. at 322-24; *Anderson*, 477 U.S. at 249-52.

## II. Factual Background

### A. Plaintiff's Employment with Echo

Echo is a federally-qualified community health care facility which provides medical care services to a medically-underinsured population in a medically-underserved area. (Deposition of Carol Collier-Smith ("Collier-Smith Dep.") at 56, 85-87, 90). Echo has three locations in Evansville. (*Id*. at 16).

On March 20, 2012, Echo hired Plaintiff as a part-time family nurse practitioner. (Deposition of Courtney McCree ("Plaintiff Dep.") at 21; Courtney McCree's Responses to Request for Production of Documents ("McCree") 000001). She became a full time employee on May 7, 2012, and was assigned to Echo's John Street location. (Plaintiff Dep. at 21; McCree 000001; Collier-Smith Dep. at 17). A family nurse practitioner provides primary health care services to patients which include assessing patient physiological status, performing diagnostic and preventive procedures and prescribing medications to patients. (McCree 000006-000007).

During Plaintiff's term of employment, Amanda Higgs was the Site Manager and, in November 2012, Higgs was replaced by Latricia McCutchan (a/k/a "Puddy"). (Deposition of Latricia McCutchen ("Puddy Dep.") at 12; Plaintiff Dep. at 25-26). The Site Manager was considered the supervisor of employees at the John Street location and was in charge of all day-to-day operations, scheduling, staffing, operational questions and similar issues. (Collier-Smith Dep. at 18-19). An employee first reported work-related issues to the Site Manager and, if the issue remained unresolved, the employee brought those issues to Chief Operating Officer Carol Collier-Smith. (*Id.*).

Plaintiff's offer of employment advised Plaintiff that the minimum productivity expectations set by the federal government for a mid-level provider such as herself was 175 patients per month. (McCree 000001). Plaintiff also received a copy of a job description for her position. One of the requirements of her position was to communicate effectively and professionally with staff, clients, nurses, peers, supervisors and other

collaborative community agencies. (McCree 000006-000007). Plaintiff's job description also required her to timely lock (or input) notes of patient encounters in the electronic medical record ("EMR") system within 72 hours. (Plaintiff Dep. at 23; McCree 000006-000007).

For the first few months of Plaintiff's employment with Echo, Plaintiff worked with several nurses. (Plaintiff Dep. at 27). However, in August 2012, Echo assigned Amber Garrett, RN, as Plaintiff's nurse. (*Id*.). Garrett worked with Plaintiff until June of 2013, when Garrett took maternity leave under the FMLA. (*Id*. at 37). While Garrett was on FMLA leave, Plaintiff was assigned other nurses. From time to time, Plaintiff requested assignment of an additional nurse to assist her. (*Id*. at 129, 130, 132, 133; Defendant Echo Community Health Care, Inc.'s Responses to Request for Production of Documents at 122-124). Echo refused to provide her another nurse because her patient volume did not warrant another nurse. (Plaintiff Dep. at 129, 130, 132, 133; Echo 122-124). Plaintiff had only one nurse to assist her on any given day during the entire term of her employment. (Collier-Smith Dep. at 64).

### B.    Communication Issue with Nurse Dabe

On June 27, 2012, not long after Plaintiff was hired, Plaintiff was assigned Echo nurse, Diane Dabe, LPN, to assist her. (Plaintiff Dep. at 69-71). Plaintiff disputes whether her communications with Dabe were negative; however, she admits Dabe told her, "I can't work like this" and left. (*Id*. at 71). It was reported to Collier-Smith that Dabe felt as though Plaintiff humiliated and embarrassed her in front of her peers and

4

patients and that she left work that day in tears. (Collier-Smith Dep. at 78). Collier-Smith testified the issue was concerning to her because Dabe "had such a stellar reputation and employment history with [Echo]", and Echo never had an issue with her. (*Id*. at 82).

On June 29, 2012, Higgs met with Plaintiff to discuss what occurred with Dabe. (Plaintiff Dep. at 117-118; Echo 00403). Higgs advised Plaintiff that staff complained she had an abrasive tone and found her unapproachable at times. (Echo 00403). Plaintiff stated she did not appreciate the conversation and she walked out of Higgs' office. (*Id*.). A few days later, Plaintiff met with Collier-Smith because she did not like the way Higgs spoke to her during their June 29 meeting. (Collier-Smith Dep. 95). Plaintiff also expressed concern over the manner in which the nurses treated her. (*Id*. at 82). Collier-Smith informed Plaintiff that she expected the nurses to treat her with respect, and she expected Plaintiff to treat the nurses and other Echo staff with respect. (*Id*.).

### C. Billing Code Issue at the Surgery Center

On June 21, 2012, Plaintiff sent an e-mail to Carla Acker and Julie Adams, both of whom worked in the billing department, questioning how she should enter billing codes and chart assessments when working at the Surgery Clinic. (Plaintiff Dep. at 216, 217; Echo 002092-002094, 00345). The Surgery Clinic was a specialty clinic offered at John Street where surgeons from Evansville Surgical Associates volunteered to come once a month and see Echo's uninsured patients. (Collier-Smith Dep. at 54; Plaintiff Dep. at 217). During those Surgery Clinic days, Plaintiff would work with the volunteer surgeon,

follow him around, document everything that he did in the office, and enter the information into the EMR system. (Collier-Smith Dep. at 54; Plaintiff Dep. at 217). Plaintiff was tasked with these documentation duties because the volunteer physicians did not have access to Echo's EMR system. (Plaintiff Dep. at 221-222). In her e-mail, Plaintiff stated she was not comfortable entering the information into the EMR system because she was not the one providing the care. (*Id.* at 218, 222; Echo 0002092-002094, 00345). To ensure against any misunderstanding about who provided the care, Plaintiff entered the notes in the EMR system as "per Dr. Kaiser." (Plaintiff Dep. at 218, 224; Echo 002092-002094, 00345). On June 22, 2012, Collier-Smith responded to Plaintiff's e-mail advising that no billing is actually submitted for the Surgery Clinic services and that her EMR entries are only for tracking the services provided. (Plaintiff Dep. at 222; Echo 002094).

For reasons unrelated to Plaintiff's documentation questions, Echo stopped providing the Surgery Clinic in the fall of 2012, and Plaintiff had no further involvement in any additional Surgery Clinic documentation after that date. (Collier-Smith Dep. at 54, 56). Plaintiff acknowledged in her deposition that the way she charted the Surgery Clinic encounters in the EMR system was legal, that no one told her she could not chart the way she wanted, and that she was unaware of any negative actions against her which were directly related to her Surgery Clinic question. (Plaintiff Dep. at 224 ("Q: No. I'm asking you whether it's illegal or not. . . . A: The way I ended up charting it in the end? Q: Right. A: No."), 225).

On July 17, 2012, Faith Deffendoll from the billing department sent Plaintiff an e-mail requesting Plaintiff to change a billing code from a CPT code to a Medicare preventative code (a "G-Code") for either an initial wellness visit or a follow-up annual visit. (Plaintiff Dep. at 226; Echo 00223). Plaintiff responded on July 18, 2012, stating she was confused. (Echo 00223; Plaintiff Dep. at 227). Deffendoll responded to Plaintiff advising her why the G-Codes could be used. (Echo 00223, 01893, 002137; Plaintiff Dep. at 227-229).

**D.     Three-Month Performance Review**

In mid-August, Collier-Smith met with Plaintiff and presented her with the summary of her initial three (3) month performance review. (Plaintiff Dep. at 180-181; Echo 00140). Plaintiff received a minimum passing score of 200. (*Id*. at 178; Echo 00137; Collier-Smith Dep. at 00137). The summary page of the August 2012 performance review noted that Plaintiff had some initial problems with the way staff perceived her, but that Echo believed the problems had been resolved. (Plaintiff Dep. at 181; Echo 00140). Plaintiff acknowledged there were some initial communication problems and she agreed with the statements made in the summary page of the performance review. (Plaintiff Dep. at 181; Echo 00140).

**E.     Billing Issue with Medicare G-Codes**

On August 31, 2012, Deffendoll sent Plaintiff an e-mail stating that certain preventative medical services provided to a patient should be billed using a Medicare G-Code. (Plaintiff Dep. at 232-233; Echo 00222, 001409). Plaintiff responded with her

understanding of the requirements for billing a G-Code under Medicare guidelines, and stated that she was not comfortable using it. (Plaintiff Dep. at 232; Echo 00222).

On September 11, 2012, Echo held a medical advisory meeting where billing staff, nurse practitioners, and some of the physicians were present to discuss pediatric immunizations, and at the end of the discussions, Plaintiff brought up the topic of using Medicare G-Codes for billing. (Plaintiff Dep. at 229, 231). Plaintiff testified she verbally raised the issue of the legality of billing G-Codes, and she questioned the other medical providers about how they were doing the things necessary to bill the G-Codes. (*Id*. at 229-231). The persons present at the meeting discussed the issues raised by Plaintiff, and the discussion concluded with Acker advising Plaintiff that she would get her a copy of the requirements to bill G-Codes and they could discuss it later. (*Id*. at 242). The discussion then moved on to another topic. (*Id*.).

On September 19, 2012, Deffendoll forwarded Plaintiff's August 31, 2012, e-mail to Acker for response, and Acker responded to Plaintiff on September 25, 2012, explaining the issues and requirements for billing preventative Medicare G-Codes. (Echo 00222, 001409). After some discussion, Plaintiff thanked Acker for the clarification, and Acker advised that the patient encounter should be billed as 99214 instead of a G-Code, and the patient should be brought back to complete the remaining services for Medicare's preventative G-Code exams. (Plaintiff Dep. at 232-233; Echo 00222, 001409). Acker also provided Plaintiff with a link to certain videos and agendas located on the Echo server where Plaintiff could obtain additional information and billing requirements to

assist her in creating her own templates to ensure she provided all of the services to properly bill Medicare G-Codes.  (Plaintiff Dep. at 235; Echo 001409).

### F. Meeting with Site Manager Higgs

On September 25, 2012, Higgs met with Plaintiff to discuss several issues and concerns including Plaintiff's low productivity.  (Plaintiff Dep. at 121; Echo 00383-00384).  Higgs advised Plaintiff that after 6 months of employment, providers are expected to be serving at least 175 patients per month.  (Plaintiff Dep. at 124; Echo 00383).  Plaintiff agreed that her low productivity was a concern of hers as well.  (Echo 00383; Plaintiff Dep. at 124).

### G. Communication Issue with Puddy

On October 2, 2012, Plaintiff was speaking with her nurse, Amber Garrett, outside of Puddy's office (who was a triage nurse at the time) regarding Plaintiff's schedule.  (Plaintiff Dep. at 76-77; Collier-Smith Dep. at 96-97; Puddy Dep. at 43).  Puddy made a statement from her office in an attempt to correct the misunderstanding.  (Plaintiff Dep. at 76-77; Collier-Smith Dep. at 96-97; Puddy Dep. at 43; Echo 00130).  Plaintiff then stated, "Puddy, if you know what's going on, can you come out here and show us what's going on with the computer?"  (Plaintiff Dep. at 77; Puddy Dep. at 43; Echo 00130).  Plaintiff disputes whether her communication with Puddy was "negative"; however, Garrett later apologized to Puddy for Plaintiff's tone in the conversation.  (Collier-Smith Dep. at 97; Echo 00130, 00123).

### H. Meeting with Collier-Smith

9

On October 11, 2012, Plaintiff met with Collier-Smith at Subway, and they discussed several administrative issues raised by Plaintiff as well as Plaintiff's performance issues identified by Collier-Smith. (Plaintiff Dep. at 79-81; Collier-Smith Dep. at 98-99; Echo 00122-00124). In addition to discussing and addressing the administrative concerns raised by Plaintiff, Collier-Smith advised Plaintiff that she needed to meet the productivity standards set by the federal government. (Echo 00122-00124). Collier-Smith also raised and discussed the issue of Plaintiff's communication with her co-workers. (Plaintiff Dep. at 133; Echo 00122-00124). Collier-Smith stated that her level of concern was increasing due to the negative perception people had of Plaintiff and that it was becoming a trend. (Plaintiff Dep. at 134; Echo 00123).

Collier-Smith asked if Plaintiff had anything else to discuss and she attempted to schedule a date for another meeting. (Plaintiff Dep. at 81, 135; Echo 00123). Plaintiff became upset and tearfully left the restaurant. (Plaintiff Dep. at 81, 135; Echo 00123). Collier-Smith followed Plaintiff to her car stating that the way the meeting ended was very disappointing. (Echo 00123). Plaintiff called Collier-Smith later that night and apologized. (Plaintiff Dep. at 135; Echo 00123). During the telephone conversation, Collier-Smith advised Plaintiff that "[her] biggest and growing concern is about Plaintiff's communication and emotions . . . ." (Echo 00123-00124). The following day, October 12, 2012, Collier-Smith prepared a document for her own personal file to record the incidents with Plaintiff while the incidents were still fresh in her mind. (Collier-Smith Dep. at 135; Echo 00388-00389).

### I.	Billing Staff Complaints/Verbal Counseling

On October 24, 2012, Chief Financial Officer Cindy Shea reported that Plaintiff was harsh in her communications toward the billing staff and that Plaintiff was difficult to deal with at times.  (Collier-Smith Dep. at 101-102; Echo 00125-00126).  After the issue with the billing staff was brought to Collier-Smith's attention, she decided to issue Plaintiff a Verbal Counseling for Negative Communication.  (Collier-Smith Dep. at 135; Echo 00125-00126).  Collier-Smith created the Verbal Counseling document by referring to and building upon the document she created on October 12, 2012.  (Collier-Smith Dep. at 135; Echo 00125-00126, 00388-00389).

On October 25, 2012, Collier-Smith called Plaintiff at home and discussed the concerns brought forward by the billing people as well as the other communication incidents between Plaintiff and her co-workers.  (Plaintiff Dep. at 85-86; Collier-Smith Dep. at 101-102; Echo 00125-00126, 00392-00393).  Plaintiff challenged the report from billing staff and promptly provided Collier-Smith with copies of her e-mail communications with them.  (Collier-Smith Dep. at 73).  Collier-Smith did not perceive them as negative, so she spoke to them about the situation.  (*Id*.).  They explained to Collier-Smith that it was not so much her words, but her tone of voice and propensity to sigh.  (*Id*.).  In her notes of that conversation, she indicated that "[t]he ongoing emotional and abrupt communications from [Plaintiff] is the issue needing to be resolved."  (Echo 00125).

### J.	Meeting with Site Manager Puddy

In December of 2012, Plaintiff met with Puddy (now Site Manager) to discuss her low productivity and ways to increase her productivity. (Plaintiff Dep. at 54, 87). Plaintiff recognized the importance of increasing her productivity to meet the 175 patient per month requirement. (*Id*. at 87). However, she also placed limitations on what patients could be double booked, and when schedulers failed to comply with her scheduling instructions, Plaintiff requested that they not schedule contrary to her instructions. (*Id*. at 55-59).

### K.    Final Written Warning II/Request for FMLA

On March 15, 2013, Puddy gave Plaintiff a Final Written Warning II for attendance. (Plaintiff Dep. at 149; Echo 00111). Puddy advised Plaintiff that one more occurrence would result in termination of employment. (Plaintiff Dep. at 114; Echo 00111). Plaintiff and Puddy then discussed FMLA options, and Puddy recommended that Plaintiff apply for FMLA for chronic asthma.[1] (Plaintiff Dep. at 116, 149-151; Puddy Dep. at 18-19; Echo 00111).

On April 4, 2013, Plaintiff submitted to Echo her request for intermittent FMLA leave. (Plaintiff Dep. at 90, 203). Vicki Adams, Administrative Assistant, was in charge of receiving and processing FMLA requests for Echo employees in April of 2013, and FMLA requests were to be approved by Chief Operating Officer Sandee Strader-

---

[1] Echo's Master Schedule indicates Plaintiff took FMLA for migraine headaches as well. (*See*, *e.g*., Echo 002510).

McMillen. (Collier-Smith Dep. at 38). Puddy had no involvement in Plaintiff's FMLA application. (Puddy Dep. at 18).

On April 16, 2013, Echo exercised its option to obtain second opinions and certifications related to Plaintiff's request for intermittent FMLA. (Collier-Smith Dep. at 41). Echo paid Plaintiff for her time off work to obtain the second opinions and the time off was not charged against Plaintiff's PTO allotment. (Plaintiff Dep. at 212). Plaintiff's request for FMLA leave was ultimately approved, and she took FMLA leave on April 26, June 7, 17, and 18, July 8, 9, 17, 18, 30, and 31, and August 1 and 2. (*Id.* at 211-212; Echo 002504, 002510, 002512, 002515, 002516, 002518). Plaintiff thereafter received no discipline for attendance-related issues. (Plaintiff Dep. at 114-16, 211, 212, 325).

### L. Verbal Counseling

On April 5, 2013, Plaintiff received a Verbal Counseling for low productivity from Puddy. (Plaintiff Dep. at 151-152; Puddy Dep. at 31; Echo 0096-00101). During the Verbal Counseling, Puddy expressly advised Plaintiff that she needed to see at least 175 patients per month on a consistent basis and discussed a plan for scheduling patients in an attempt to achieve that requirement. (Plaintiff Dep. at 157-158; Echo 0096-00101). They also discussed Plaintiff's need to be more proactive and less stringent with her own scheduling demands. (Echo 0097).

### M. Boston Marathon Incident

On April 15, 2013, the day of the Boston Marathon bombing, Plaintiff became upset and tearful because her father was running in the race that day and she had not

heard from him.  (Plaintiff Dep. at 92-93, 159-164).  According to Plaintiff, Puddy told Plaintiff she would move Plaintiff's remaining two patients to Dr. Rubeena Anjum, one of Plaintiff's physician co-workers at Echo's John Street Facility.  (*Id.* at 93, 161).  Puddy testified that she told Plaintiff she would try to see if she could move Plaintiff's patients to Dr. Anjum.  (Puddy Dep. at 58-59; Echo 0093-0094, McCree 000034-000039).  Plaintiff then returned to her office for a short time and then she left work while Puddy was speaking to Dr. Anjum.  (Plaintiff Dep. at 93, 162-163).  Puddy was shocked because she had not given Plaintiff permission to leave work.  (Puddy Dep. at 58-59; Plaintiff Dep. at 165).  Puddy called Plaintiff at home around 7:00 p.m. that evening and advised Plaintiff that she did not know Plaintiff had left.  (Plaintiff Dep. at 163-164; Puddy Dep. at 58-59; Echo 0093-0094; McCree 00034-00039).

On April 22, 2013, Collier-Smith met with Plaintiff to issue a Written Warning II for patient abandonment related to the April 15, 2013, incident in which she left Echo while she still had patients scheduled.  (Plaintiff Dep. at 92-93, 167-168; Echo 0093, 0094; McCree 00034-00039).  During that meeting, Plaintiff disputed the information provided by Puddy, and stated that Puddy told her she would move Plaintiff's patients to Dr. Anjum.  (Plaintiff Dep. at 92-93).  Given the conflicting stories from Puddy and Plaintiff, Collier-Smith decided not to issue the discipline for patient abandonment at that time and to further investigate the events.  (Echo 0093-0094; McCree 00034-00039).

**N.**  **Plaintiff's Annual Performance Review, Written Counseling for Negative Communication, Written Counseling for Substandard Communication**

On April 25, 2013, Echo met with Plaintiff and conducted her Annual Performance Review. (Plaintiff Dep. at 97). Puddy previously initiated the peer review process in connection with the Annual Performance Review on February 15, 2013. (Echo 00113). Puddy then completed the majority of the first two pages of the Employee Performance Review on April 1, 2013, and the Universal Staff Standards sections on April 5, 2013. (Puddy Dep. at 49; Echo 00114-00117). Puddy also utilized for the Annual Performance Review the comparison chart of nurse practitioner productivity which she previously created and discussed with Plaintiff on April 5, 2013. (Puddy Dep. at 35-36; Echo 0098-0099). Collier-Smith reviewed the Annual Performance Review and signed her section on April 24, 2013. (Collier-Smith Dep. at 123; Echo 00115). Plaintiff then placed her own written comments on the Annual Performance Review and signed it on May 1, 2013. (Plaintiff Dep. at 183-84; Echo 00115).

During the Annual Performance Review meeting, Collier-Smith provided Plaintiff copies of the documents considered for her annual review. (Plaintiff Dep. at 182, 185). Areas in need of improvement included productivity (175 patients per month), effective communication with her peers, and patient wait times. (*Id*. at 813, 198-199; Echo 00105-00107, 00113-00117). Puddy also advised Plaintiff that she needed to maintain consistency with locking patient encounters. (Puddy Dep. at 28; Plaintiff Dep. at 193).

Plaintiff's overall score on her Annual Performance Review was 170, below Echo's standards. (Plaintiff Dep. at 187-188). Plaintiff was placed on probation for three

15

months.  Plaintiff understood her employment would be terminated pursuant to Echo's Performance Appraisal Policy if she failed to score 200 on the upcoming 3 Month Probationary Review.  (*Id*. at 196).

At the end of the Annual Performance Review, Collier-Smith gave Plaintiff a Written Counseling for Negative Communication due to the poor peer review results received in connection with the Annual Performance Review.  (*Id*. at 173-175; Echo 00102).  She also received a Written Counseling for Substandard Communication related to the April 15, 2013 incident.  (Plaintiff Dep. at 173-174, 184; Echo 00114-00115, 00102).  The results of Collier-Smith's investigation showed that there was a miscommunication between Plaintiff and Puddy regarding the transfer of patients, and that Plaintiff had left the facility without permission.  (Plaintiff Dep. at 92-93, 167-168; Echo 0093-0094; McCree 000034-000039).  Because of the miscommunication, Collier-Smith converted the Written Warning II for patient abandonment to a Written Counseling for Substandard Communication.  (Echo 0091, 0093-0094; McCree 000034-000039).

On May 1, 2013, Plaintiff signed and returned her Annual Performance Review, the Written Counseling for Negative Communication, and the Written Counseling for Substandard Communication.  (Plaintiff Dep. at 173-174, 184; Echo 00114-00115, 00102; McCree 000034-000035).  However, Plaintiff subsequently filed a grievance with Strader-McMillen challenging the Written Counseling for Substandard Communication and a grievance challenging her Annual Performance Review because Dr. Anjum and Dr. Stratton were not included in the peer review.  (Echo 00400, 00402).

On June 20, 2013, Plaintiff sent an e-mail to Strader-McMillen inquiring about the status of her grievances. (Plaintiff Dep. at 310-311; Echo 00546). She also requested Echo allow her to use FMLA time without charging it against her available vacation time. (Plaintiff Dep. at 324; Echo 00547). On June 24, 2013, following a short investigation by Strader-McMillen into the circumstances surrounding Plaintiff's grievances, Strader-McMillen determined that the discipline for Substandard Communication and her Annual Performance Review were valid and just, notwithstanding the fact that Dr. Anjum and Dr. Stratton were not included in the peer review section. (Echo 00546). Puddy admitted the doctors should have been included, and that it was an oversight on her part. (Echo 00400, 00402). Strader-McMillen also denied Plaintiff's request to preserve vacation time due to a provider shortage at the John Street facility and upcoming summer vacations across the organization. (Plaintiff Dep. at 310-311, 324; Echo 00546-00547).

### O.     Meeting with Collier-Smith and Puddy

On May 17, 2013, Collier-Smith and Puddy had an informal meeting with Plaintiff and Gretchen Miller, RN, to discuss the complaints the two had of each other. (Plaintiff Dep. at 98-99; Puddy Dep. at 66-67; Collier-Smith Dep. at 144; Echo 00408-00409). Puddy asked Collier-Smith to assist with the meeting because she was hearing two sides of the same story. (Puddy Dep. at 66-67; Collier-Smith Dep. at 142-144; Echo 00408-00409). Collier-Smith understood Puddy's "frustration with [Plaintiff]" and noted that "[t]hese types of meetings are a huge waste of professional time and it will have to stop." (Echo 00408-00409). Following the meeting, Plaintiff and Miller did not speak to one

another again.  (Plaintiff Dep. at 99) ("We just had no communication from then, Gretchen and I.").

**P.     Anonymous Complaints**

On June 17, 2013, Puddy returned from vacation and found three (3) complaints from nursing staff in her Echo mailbox regarding Plaintiff's continued failure to communicate effectively and professionally.  (Puddy Dep. at 45).  Puddy was not surprised by the complaints, and she did not conduct any follow up investigation of the complaints because complaints regarding Plaintiff were common.  (*Id*. at 54-55).  Puddy placed the complaints in her file and used them in connection with her completion of the peer review section of Plaintiff's 3 Month Probationary Review.  (*Id*. at 54).

Echo later identified the authors of each of the complaints as Gretchen Miller, RN, Kelly McKittrick, RN, and Heather Smith, RN – all nurses of Echo who worked with Plaintiff before and during Garrett's FMLA leave.  (*Id*. at 53-54; Collier-Smith Dep. at 107; Plaintiff Dep. at 103, 194-195; Affidavit of Gretchen Miller; Affidavit of Kelly McKittrick; Affidavit of Heather Smith).  However, no one from Echo attempted to find out exactly which nurse authored which one of the three (3) nursing staff complaints until approximately September 2014.  (Collier-Smith Dep. at 107-108; Puddy Dep. at 45).  Plaintiff testified that she had previously discussed with Puddy her concerns and the communication issues she was having with Miller, McKittrick, and Smith.  (Plaintiff Dep. at 103, 194).

**Q.     Plaintiff is Terminated**

On July 22, 2013, Puddy created the summary section of the Probationary 3 Month Multi-Disciplinary Peer Review. (Puddy Dep. at 53; Echo 0075). Puddy then presented the peer review summary to Collier-Smith, and Collier-Smith completed the remaining sections and signed the document on July 30, 2013. (Collier-Smith Dep. at 128; Puddy Dep. at 51, 54-55; Echo 0067, Echo 0069-0078). As noted in the 3 Month Probationary Review, Plaintiff failed to meet her productivity requirement for the month of May, Plaintiff had the lowest patient satisfaction scores of any provider, a large majority of her patient encounters were not timely locked in the EMR, and Plaintiff's peer review results were not satisfactory. (Plaintiff Dep. at 200-202; Echo 0067, 0069-0078; Collier-Smith Dep. at 149). Plaintiff's overall score was 160, well below the minimum 200 points required by Echo policy. (Collier-Smith Dep.at 147-148; Echo 0074).

From Tuesday, July 30, 2013, through Friday, August 2, 2013, Plaintiff took FMLA leave. (Plaintiff Dep. at 203, 205; Echo 002518). On August 2, 2013, Dr. Anjum sent an e-mail to Collier-Smith regarding the burden of covering for Plaintiff's patients due to her sick leave. (Collier-Smith Dep. at 146; Echo 00313). Collier-Smith responded, "[h]er absences are out of our hands because of her approved medical leave but we are working on a plan to help manage this challenge while respecting her covered rights and her health issues." (Collier-Smith Dep. at 147; Echo 00313). Collier-Smith testified in her deposition that although the decision was made to terminate Plaintiff's

employment three (3) days earlier, she could not tell Dr. Anjum about Echo's decision at that time. (Collier-Smith Dep. at 147-148).

On Monday, August 5, 2013, Collier-Smith and Strader-McMillen met with Plaintiff, discussed her 3 Month Probationary Review, and terminated her employment pursuant to Echo policy. (Plaintiff Dep. at 110-111, 191, 196; Collier-Smith Dep. at 109, 126, 128; Echo 0060-0061).

## III. Discussion

Under the FMLA, an eligible employee may take up to 12 weeks of leave in a one-year period to care for a family member with a serious health condition. 29 U.S.C. ' 2612(a)(1). In an effort to protect an employee who exercises her right to leave, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. 29 U.S.C. § 2615(a)(1). In addition, an employer may not retaliate against an employee for exercising her FMLA rights. *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012). "An interference claim requires proof that the employer denied the employee FMLA rights to which she was entitled; a retaliation claim requires proof of discriminatory or retaliatory intent." *Id.* (citing *Goelzer v. Sheboygan County, Wis.,* 604 F.3d 987, 995 (7th Cir. 2010)). Plaintiff brings both an FMLA interference claim and a retaliation claim. The court will begin with Plaintiff's FMLA interference claim.

### A. FMLA Interference Claim

To prevail on an FMLA interference claim, a plaintiff must establish that: "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Goelzer*, 604 F.3d at 993 (citing *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)). The parties' dispute only the fifth element.

A plaintiff may establish an interference claim with evidence that the employer "discourag[ed] an employee from using such leave," 29 C.F.R. § 825.220(b), or with evidence that the employer used "the taking of FMLA leave as a negative factor in employment actions, such as . . . disciplinary actions." 29 C.F.R. § 825.220(c). Based on these regulations, Plaintiff argues that even though Echo never denied her FMLA leave nor disciplined her for taking FMLA leave, it interfered with the exercise of her FMLA rights in three ways: (1) by changing the manner in which the minimum patient quota was established; (2) by the way it calculated her productivity score in her Annual Review in April 2013; and (3) by the way it conducted peer reviews and calculated the points on her Annual Review related to her interdisciplinary relationships.

With respect to the monthly patient quota, Plaintiff asserts that Collier-Smith informed her at the beginning of her employment that she would never be held accountable for patients that did not show up for their appointments. (Plaintiff Dep. at

53).  Plaintiff contends Echo changed the terms of her employment[2] by requiring her to

actually *see* 175 patients per month.  The interference claim arises from Plaintiff's

allegation that the minimum monthly patient quota required her to work more, meaning

she "would not be able to take as many FMLA days as she would need."

Collier-Smith testified that "no-shows" do not count toward the monthly patient

goal of a mid-level provider like Plaintiff, and that "it was a goal even in the intro period

evaluation."  (Collier-Smith Dep. at 61).  Unlike Plaintiff's testimony, Collier-Smith's

testimony is supported by the evidence in the record.  For example, Plaintiff's offer of

employment stated that the minimum productivity goal set by the federal government was

175 patients a month.  (McCree 000001).  As far back as August of 2012 – long before

Plaintiff requested FML –  Echo informed Plaintiff that one of her goals for the coming

month was to "meet the federal government's productivity at 175/month."  (Echo 00140).

In September 2012, Higgs informed Plaintiff that after six months of employment, Echo

expected her to see 175 patients per month.  (Echo 00383) ("I informed her she should be

seeing 175 pt. in a month time").  In October 2012, Collier-Smith reiterated that

sentiment, and in December 2012, Plaintiff initiated a meeting with Puddy to discuss

ways to improve her productivity.  (Echo 00122-00124; Plaintiff Dep. at 54, 87).  Thus,

well before Plaintiff requested FMLA leave in April 2013, the evidence reflects that

---

[2] Plaintiff opines that had Echo counted the "no shows" as part of her monthly patient quota, she
would have met the quota of 175 patients per month for the majority of the time she worked
there.  (*Id.*) (testifying that even counting no-shows, she did not think she "was quite at 175" for
the months of May, November, and December 2012).

Plaintiff's productivity was an issue. Indeed, it was one of the principle factors which led to her termination. In sum, the evidence does not support Plaintiff's claim that Echo changed the terms of her employment to interfere with the exercise of her FMLA leave.

With respect to Plaintiff's Annual Performance Review dated April 2013, Plaintiff finds her varying scores to be suspicious. In the Essential Job Skills section that reads, "Leads care team in provision of excellent clinical care and in meeting federally-required productivity standards," Plaintiff received a "meets expectation" score, but in the Universal Staff Standards, Planning & Time Utilization section, Puddy gave Plaintiff a "below expectations" score. (*Compare* Echo 00115, *with* Echo 00117). The latter section covers an employee's ability to prioritize her workload, her ability to adjust work flow, and her ability to accomplish an assigned workload by the end of the work day. (Echo 00117). The Essential Job Skills section is dated April 1, 2013, and the Universal Staff Standards section is dated April 5, 2013 – one day after she requested FML. Because, in Plaintiff's view, both sections cover an employee's productivity, Plaintiff claims her review is indicative of when "[Echo] began to use the productivity standard against her in an attempt to prevent her from using her FMLA relief moving forward."

Although Puddy gave Plaintiff a "meets expectations" score in the Essential Job Skills section dealing with productivity, Puddy wrote in the "Comment" section associated with that job skill that Plaintiff only met Echo's productivity standards two out of the last ten months. (Echo 00114). Plaintiff's productivity was listed as one of the areas Plaintiff needed to improve upon during her probationary period. (Echo 00115

(stating under the Measurable Goals section, "consistently meet productivity standards (175/month) beginning May 2015"). Thus, Puddy's scores are not inconsistent.

Moreover, Puddy *recommended* that Plaintiff apply for intermittent FMLA leave on March 15, 2013 – only three weeks earlier. (Puddy Dep. at 18-19; Echo 00111). Puddy also requested and used intermittent FMLA leave herself. (Puddy Dep. at 18-19). Finally, there is no evidence that Puddy knew that Plaintiff requested FMLA leave when she filled out the disputed section on April 5, 2013. (*Id*. at 18) ("Q: what involvement did you have in processing [Plaintiff's] FMLA application? A: Absolutely none. I just recommended it."). On these facts, no reasonable jury could agree with Plaintiff's speculative argument that Puddy decided to issue discipline and reduce Plaintiff's Annual Review scores because Plaintiff followed Puddy's recommendation and requested FMLA leave.

Finally, with respect to Plaintiff's complaint regarding the Universal Staff Standards, Interdisciplinary Relationships section of her Annual Review, Plaintiff failed that section due to poor peer reviews and a Verbal Counseling issued in October of 2012. Plaintiff challenges Puddy's assessment in two ways. First, she argues the peer reviews "were likely negative since [Puddy] failed to provide Dr. Stratton and Dr. Anjum with peer reviews for them to complete." Second, she argues that the complaints from the billing department that resulted in a Verbal Counseling in October 2012 were based on e-mails that even Collier-Smith conceded were not negative or disrespectful. She then surmises that had Puddy conducted a fair review, she would have passed both the

24

Interdisciplinary section and the Planning & Time Utilization section, resulting in a score above 200. Her interference claim is premised on the fact that, following her Annual Review, she was placed on probation – in her words, "a clear attempt to interfere with Plaintiff's protected rights under the FMLA.

Plaintiff correctly asserts that the peer reviews should have been given to Dr. Anjum and Dr. Stratton; however, her claim that their two reviews would have outweighed all of the negative reviews she received from Echo's John Street staff is based on pure speculation. Second, Collier-Smith reviewed the e-mails from the billing department and, having found they were not overtly rude or inappropriate, she personally spoke to the members of that department. They informed Collier-Smith that the problem they had with Plaintiff was the manner in which she spoke to them. (Collier-Smith Dep. at 73 ("Q: So do you think it was just them talking with each other in the department? A: Tone. They per - - what they said was it was her tone and sighing . . . ."). On these facts, no reasonable jury would conclude that Echo placed Plaintiff on probation simply to interfere with the exercise of her FMLA rights. Accordingly, Echo's motion for summary judgment on Plaintiff's FMLA interference claim is **GRANTED**.

### B.     FMLA Retaliation Claim

A plaintiff asserting an FMLA retaliation claim may establish her claim using the direct or indirect method of proof. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014). Plaintiff proceeds under the direct method of proof, which requires her to present evidence of (1) a statutorily protected activity; (2) a materially adverse

action taken by the employer; and (3) a causal connection between the two. *Id.* The first two elements are not disputed. The parties dispute only whether Plaintiff has evidence supporting an inference that the exercise of her FMLA rights caused her termination. Plaintiff does not have direct evidence – *i.e.*, something akin to an admission by her employer. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). Instead, she relies on a mosaic of circumstantial evidence to establish the third element.

The types of circumstantial evidence a plaintiff may rely upon include "suspicious timing, ambiguous statements from which retaliatory intent can be inferred, evidence of similarly situated individuals who were treated differently, or evidence that the employer offered a pretextual reason for the termination." *Langenbach*, 761 F.3d at 800. On summary judgment, this circumstantial evidence must point "'directly to the conclusion that an employer was illegally motivated, without reliance on speculation.'" *Id.* (quoting *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 676 (7th Cir. 2012)).

### 1.    Suspicious Timing

Plaintiff points to the following as evidence of suspicious timing: (1) those portions of Plaintiff's Annual Review, *supra*, that were filled out by Puddy on April 5, 2013, the day after she requested FMLA leave; (2) Plaintiff's Verbal Counseling for failing to meet her monthly quota of 175 patients per month, which also occurred on April 5, 2013; (3) Collier-Smith's decision not to include "no-shows" in the monthly patient quota; (4) her termination, which occurred the day she returned from FMLA leave

26

(August 5, 2013); and (5) Dr. Anjum's August 2, 2013 e-mail that laments Plaintiff's absences.

As mentioned previously, Puddy recommended that Plaintiff apply for FMLA, but there is no evidence that Puddy knew she actually applied for it as of April 5, 2013. There is, therefore, no evidence that Plaintiff's application for FMLA leave had anything to do with Puddy's review of Plaintiff or with her Verbal Counseling. Indeed, Plaintiff had problems meeting her productivity requirement both before and after April 5, 2013. The fact that Collier-Smith did not include "no-shows" as part of her monthly patient quota is not unusual, as every Echo provider at her level was required to meet that monthly minimum. Moreover, Collier-Smith made the decision to terminate Plaintiff on July 30, 2013. As Plaintiff was on FMLA July 30, 31, August 1 and August 2, the only time Collier-Smith could inform Plaintiff of Echo's decision was when she returned to work on Monday, August 5. Finally, Dr. Anjum's August 2nd e-mail expresses her frustration at being the only provider at Echo's John Street facility to see patients that day. Collier-Smith responded that Plaintiff's FMLA leave was a covered right, and that Echo was working on a plan to help manage the challenge it posed. (Echo 00313). Collier-Smith could not inform Dr. Anjum of Echo's decision to terminate Plaintiff's employment, because Echo had not yet met with Plaintiff to inform her of that decision. In sum, the August 2nd e-mail chain between Dr. Anjum and Collier-Smith does not reflect retaliatory intent.

### 2.     Ambiguous Statements

Plaintiff next argues that retaliatory intent can be inferred from the reactions and tone of two e-mail threads between Collier-Smith and Puddy. The first of these, dated April 19, 2013, is an e-mail from Puddy informing Collier-Smith that Plaintiff texted her at 7:56 a.m. to tell her that she would be late because her car would not start. (Echo 00406). Plaintiff had a patient who was scheduled for 8:00 a.m. that day. (*Id.*). Collier-Smith responded that she was "speechless," and asked if she was typically late. (*Id.*). After Puddy informed her that Plaintiff was normally on time, Collier-Smith told Puddy to have "a conversation with her today about the timing: she wasn't going to be on time if her car had started and the issue for all direct care staff/hourly and salary is [patient] care." (*Id.*). At most, the reaction and tone of this e-mail stream reflects the frustration Puddy and Collier-Smith felt as a result of the continuing issues that arose from Plaintiff's employment. There is no evidence to suggest that the e-mail stream had anything to do with Plaintiff's FMLA request.

The next e-mail is dated June 18, 2013. In the e-mail, Puddy informs Collier-Smith and Dr. Anjum, among others, that Plaintiff was out sick, and that any "TEs" for Plaintiff's patients will be forwarded to Dr. Anjum. (Echo 00376). Collier-Smith replies that they "need to talk about [Plaintiff], etc." and asks if she can meet the following morning. (*Id.*). At Puddy's deposition, Puddy could not recall what the meeting was about; she speculated that it might have been over scheduling or, possibly, Plaintiff's attendance. (Puddy Dep. at 65). Echo's counsel objected as Plaintiff's counsel's questions called for speculation. (*Id.*). As with the first e-mail presented by Plaintiff,

there is no evidence to suggest that this e-mail thread or the content of the subsequent meeting had anything to do with Plaintiff's FMLA request.

### 3. Similarly Situated Employees

Employees are similarly situated if they are "directly comparable to [Plaintiff] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Plaintiff's comparators are Marsha Spalding and Alan Swarz, both of whom were nurse practitioners in practice with Echo during the time of Plaintiff's employment and termination. Plaintiff argues they were treated more favorably than she because they each had 1.5 nurses to assist them, but she only received one (1) assigned nurse. Had she been given an additional nurse or another to share, she believes her productivity would have improved. Plaintiff further argues that Collier-Smith conceded in an e-mail to her that she was not being given the same level of support as Spalding and Swarz, thus "admitting" that Spalding and Swarz were being treated better than she.

Spalding and Swarz worked at a different Echo facility, and thus, were not under Puddy's supervision. In addition, they were both long-term employees of Echo, and their patient volume exceeded Plaintiff's, thus warranting additional assistance. (Collier-

Smith Dep. at 63-64, 67-69; Echo 0098-0099). Neither Spalding nor Swarz had issues with their peers, and neither had significant issues with timely locking their patient notes. Spalding and Swarz are not similarly situated to Plaintiff.

Plaintiff's assertion that her productivity would have improved by the addition of another nurse to assist her is not necessarily borne out by the evidence. Collier-Smith testified that Shelia Jenson, a nurse practitioner who began her employment with Echo in 2011, also had one (1) assigned nurse during the entire term of Plaintiff's employment and Jenson consistently had a much higher level of productivity than Plaintiff had. (Collier-Smith Dep. at 63-64, 67-69; Echo 0098-0099).

Further, Plaintiff asked for an additional nurse as far back as October 2012, long before she requested FMLA. (Echo 00122). Collier-Smith informed Plaintiff that her productivity had to improve before that request would be considered. (*Id*.). Collier-Smith's "admission" that "other mid-level's typically have 1.5 nurses to assist" does not help her case; the balance of the e-mail explains, "The open access schedule you are on [sic] 32 hours/week is new and all of us need time to assess that along with again, the consistency of productivity before a permanent staffing increase is given." (Echo 00771). In sum, Plaintiff's evidence does not support a finding that similarly situated nurse practitioners were treated more favorably than her due to her request for FMLA.

### 4.    Pretext

Echo asserts it terminated Plaintiff pursuant to Echo's Performance Appraisal Policy because of Plaintiff's poor performance, a legitimate, non-discriminatory reason.

More specifically, Plaintiff failed to score a minimum of 200 points on her Annual Performance Review, was placed on probation for three (3) months, and re-evaluated in her 3 Month Probationary Review. Plaintiff again failed to score the minimum 200 points required and her employment was terminated pursuant to Echo's Performance Appraisal Policy. Plaintiff argues Echo used the Annual Performance Review and the 3 Month Probationary Review as a means to validate their unlawful termination of her employment.

The court's pretext inquiry is not concerned with whether the employer's stated reason for terminating an employee is fair, wise, or accurate. *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 464 (7th Cir. 2014); *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013). Rather, the court's concern is whether the employer honestly believed the reasons it has offered to explain the termination. *Collins*, 715 F.3d at 1000. Thus, "the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id*. (quoting *Coleman*, 667 F.3d at 852).

First, Plaintiff claims that the three (3) unsolicited complaints that Puddy received in her mailbox on July 17, 2013, were unfairly included in the peer review section of Plaintiff's 3 Month Probationary Review. According to Plaintiff, Echo felt no duty to determine who authored the complaints; they just "blindly accepted" them while at the same time ignored her complaints about (as it turns out) the same co-workers. Consequently, Plaintiff argues, she failed the "Interdisciplinary Relationships" section of her review – a contributing factor in her termination.

The receipt of complaints from both Plaintiff and her co-workers provided undeniable evidence that Plaintiff was still having issues communicating with her co-workers in a professional manner. While Plaintiff argues that Echo should have investigated the complaints to determine who was at fault, Puddy testified that she had no reason to investigate the source of the complaints because "every day there was something" with Plaintiff. (Puddy Dep. at 55). Plaintiff "was a hard person to work with" and "everybody had issues" with her. (*Id*.).

In Plaintiff's Annual Review, one of her measurable goals was to communicate in a professional manner and to receive an overall positive peer review in three (3) months. (Echo 00115). Because the complaints were written during the probationary period immediately following Plaintiff's Annual Review, Puddy included the co-worker complaints as part of the Peer Review summary prepared on July 22, 2013. (Echo 0075). Echo's consideration of the three (3) co-worker complaints in connection with the interdisciplinary relationship score is insufficient evidence from which one can infer retaliatory motive.

Plaintiff next contends that her Annual Review and 3 Month Probationary Review are inconsistent with respect to the time requirement of locking patient encounters within seventy-two (72) hours. In her Annual Review, she received a "meets" expectations score despite having been issued three citations for failing to do the same, but in her Probationary Review, she received a failing score. As her Annual Review is dated just

before she requested FMLA, Plaintiff argues these inconsistent scores reflect a retaliatory motive.

As noted above, Plaintiff had issues with timely locking patient encounters prior to her application for FMLA leave. In Plaintiff's Annual Review dated April 1, 2013, Plaintiff had improved in this area. Puddy noted in the "Comments" section that Plaintiff had "[i]mproved in locking encounters in a timely fashion." (Echo 00114). Puddy also noted in the Site Manager Comments that "consistency is what needs to be strived for." (Echo 00115).

By the time of Plaintiff's 3 Month Probationary Review, Plaintiff's performance in this area had slipped. In Section B of her Review, Echo noted that from May 1, 2013, to July 19, 2013, 77% of Plaintiff's patient encounters were not timely locked. (Echo 0070). Plaintiff understood that this was an important job requirement; however, because she was not counseled during her probationary period regarding this requirement, she did not place it at the top of her list of things to do. (Plaintiff Dep. at 193).

Echo's scoring on the Annual Review and the 3 Month Probationary Review with respect to Plaintiff's completion of patient encounters is not inconsistent. Echo noted that Plaintiff had improved in her Annual Review, but noted Plaintiff's decline in her Probationary Review. A 77% failure rate is not inconsequential. It was, quite appropriately, a factor in her termination.

The balance of Plaintiff's pretext inquiry consists of arguments regarding: (1) the "changing" manner in which "no shows" were counted toward her monthly patient quota;

(2) the manner in which her productivity was calculated on her Annual Review; and (3) the manner in which peer reviews were handled in her Annual Review. These arguments were addressed and rejected by the court in the Suspicious Timing section of this opinion.

Plaintiff's mosaic of circumstantial evidence does not point directly to the conclusion that Echo's decision to terminate Plaintiff's employment was motivated out of a desire to retaliate against Plaintiff for the exercise of her FMLA rights. Accordingly, Echo's motion for summary judgment on Plaintiff's FMLA retaliation claim is **GRANTED**.

### C. Indiana Retaliatory Discharge Claim

The last claim at issue is one premised on Indiana law; that is, whether Plaintiff was discharged solely for refusing to commit an unlawful act for which she would be personally liable. *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 393 (Ind. 1988). Because the court has granted summary judgment in favor of Echo on Plaintiff's federal claims, the court must determine whether to take supplemental jurisdiction over this state law claim. *See* 28 U.S.C. § 1367(c)(3) (stating that the court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction"). The analysis hinges on whether the state law claim is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Plaintiff's claim arises from Echo's decision to terminate her employment. This claim is, therefore, so related to Plaintiff's FMLA claims as to form

part of the same case or controversy.  Therefore, the court elects to exercise supplemental jurisdiction over Plaintiff's state law claim.

Plaintiff points to two instances in which she claims Echo requested Plaintiff to commit an illegal act, which she refused to do.  The first instance occurred in June 2012, when Plaintiff asked the billing department how to enter billing codes and chart assessments when she was assisting volunteer physicians in the Surgery Center.  Plaintiff contends this practice violated Indiana Code § 25-1-9-4(a)(6), which provides that a practitioner is subject to disciplinary sanctions if, after a hearing, "a practitioner has allowed the practitioner's name or a license issued under this chapter to be used in connection with an individual who renders services beyond the scope of that individual's training, experience, or competence."

Echo asked Plaintiff to document what occurred because the volunteer physicians did not have access to Echo's EMR system.  Upon the receipt of Plaintiff's e-mail noting concern over the propriety of this action, Echo assured Plaintiff that Echo did not bill for the Surgery Clinic services and that her EMR entries were only for tracking the services provided.  Plaintiff testified that, to ensure the records were accurate, she entered the notes in the EMR system noting the physician who rendered the service, such as "per Dr. Kaiser."  (Plaintiff Dep. at 218, 224; Echo 002092-002094, 00345).  Plaintiff acknowledged in her deposition that the way she ultimately charted the Surgery Clinic encounters was legal.  (Plaintiff Dep. at 224).

The second instance occurred in August and September of 2012, when Plaintiff questioned the use of Medicare G-codes for certain patient visits. When billing noticed that Plaintiff provided the type of services which could be billed under a G-Code, they asked Plaintiff to correct her billing to meet Medicare's billing standards. Plaintiff then responded that she had not performed all of the required services and billing agreed with her. There is no evidence that Echo asked Plaintiff to do anything illegal, or that Plaintiff actually refused to engage in any illegal activity. Accordingly, Echo's motion for summary judgment on Plaintiff's retaliatory discharge claim must be **GRANTED**.

## IV.  Conclusion

For the reasons set forth above, the court **GRANTS** Echo's Motion for Summary Judgment (Filing No. 29). A final judgment shall issue forthwith.


**SO ORDERED** this 13th day of April 2015.


                              _____
                              RICHARD L. YOUNG, CHIEF JUDGE
                              United States District Court
                              Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.